# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

### Holding a Criminal Term
### Grand Jury Sworn in on March 13, 2025

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | | |
| | : | Criminal No. _____ |
| v. | : | |
| | : | **Grand Jury Original** |
| BAHADIR HATIPOGLU | : | |
| | : | **VIOLATIONS** |
| AND | : | |
| | : | **18 U.S.C. § 1349 (Conspiracy to Commit Wire Fraud)** |
| RALF GRYWNOW, | : | |
| | : | |
| Defendants. | : | **18 U.S.C. §§ 1343 & 1346 (Wire Fraud)** |
| | : | |
| | : | **18 U.S.C. § 2(a) (Aiding and Abetting)** |
| | : | |
| | : | **18 U.S.C. §§ 981(a)(1)(c) and 982(b)(1), 28 U.S.C. § 2461(c) and 21 U.S.C. § 853(p) (Criminal Forfeiture)** |

## INDICTMENT

The Grand Jury charges that at all times relevant to this Indictment:

### Overview

1.      Between in or around June 2014 and in or around December 2022, the owner of a Turkish construction company and an official working for the North Atlantic Treaty Organization ("NATO") engaged in a fraud scheme. The scheme involved the owner bribing the NATO official with money and other forms of remuneration. In exchange, the NATO official gave the construction company favorable treatment on NATO construction contracts and signed fraudulent evaluations of the company's prior performance that favorably recommended the company for

projects with the United States military. The construction company owner then used these evaluations to defraud and attempt to defraud the United States military.

2.      As detailed below, the construction company owner and the NATO official conducted this scheme by using or causing to be used wire communications, such as emails and text messages, that were sent to the United States.

## COUNT 1
### (Conspiracy to Commit Wire Fraud)
### [Title 18, United States Code, § 1349]

3.      NATO was a military alliance of which the United States was a member.

4.      The NATO Support and Procurement Agency ("NSPA") was an organization within NATO that served as a logistics and procurement agency supporting NATO's mission.

5.      The United States Army Corps of Engineers ("USACE") was a component of the United States Army that authorized, oversaw, and paid for construction projects that advanced American interests both in the United States and across the world.

6.      The Defense Logistics Agency ("DLA") was another component of the United States military that provided, among other things, logistical support to the United States military including logistical support at United States military bases in Afghanistan.

### Procurement Process with U.S. Military Agencies

7.      USACE and the DLA solicited bids from third-party contractors to perform construction and other projects for USACE and the DLA. In evaluating bids for such contracts, a part of USACE's and the DLA's assessment was the bidder's performance on previous projects, which USACE and the DLA measured in part through past performance questionnaires that were supposed to be filled out by prior clients of the bidder.

8.      To perform such assessments, USACE used standardized United States government forms that had title headers such as "USACE Past Performance Questionnaire." For the portions of the forms that included an evaluation of the contractor's prior work, the forms directed that the prior client complete the evaluation. The forms further directed that a contractor could rely on the same forms for multiple contract bids.

9.      The DLA used a similar past performance questionnaire that specifically identified the DLA as the recipient of the information requested in the form. The DLA required that the contractor's prior client fill out the portion of the DLA questionnaire related to past performance and that the prior client provide a narrative assessment for multiple parts of the evaluation. For example, one question on the DLA form asked, "Did the [contractor's] service comply with contract requirements?" The form required a rating of "Excellent," "Very Good," "Satisfactory," "Marginal," or "Unsatisfactory" and then provided further space for a required narrative assessment.

10.     The DLA form also directed that the prior client send the form directly to the DLA and not provide a copy to the contractor.

11.     When evaluating a contractor's proposal and determining whether to award a contract to the proposing contractor, it was material to USACE and the DLA that any past performance questionnaire be prepared and signed by the prior client in accordance with the instructions and representations on the form used for the questionnaire and completed by a prior client who had not been subject to the influence of bribes and kickbacks paid by the proposing contractor. It was also material to USACE and the DLA that past performance questionnaires accurately disclosed any contractual violations occurring as a result of bribery or kickbacks.

3

Defendants and Related Entities

12.    Company-1 was a Turkish construction company that also sometimes operated as Company-2. Both entities will be referred to here as "Company-1."

13.    From at least in or around June 2014 until at least in or around December 2022, Company-1 bid for, was awarded, and performed various contracts for NATO, USACE, and the DLA.

14.    Defendant BAHADIR HATIPOGLU ("HATIPOGLU") was the owner and General Manager of Company-1. HATIPOGLU had no known residence in any judicial district of the United States. HATIPOGLU was a Turkish national.

15.    Defendant RALF GRYWNOW ("GRYWNOW") worked for NSPA, from in or around January 2008 until at least in or around December 2022, in positions that included Civil Engineer, Infrastructure Support Specialist, Senior Technical Officer, and NATO Infrastructure Advisor and Project Manager. Throughout this time period, GRYWNOW owed a fiduciary duty to NATO and NSPA. GRYWNOW had no known residence in any judicial district of the United States. GRYWNOW was a German national.

16.    Consistent with NATO and NSPA policies and the duties GRYWNOW owed to NATO and NSPA, GRYWNOW was prohibited from using his NATO and NSPA position for personal advantage. With the exception of gifts of insignificant token value, GRYWNOW was prohibited from accepting things of value from any external source—including from commercial firms or individuals doing business with or seeking to do business with NATO and NSPA, such as Company-1.

17.     NATO and NSPA likewise prohibited suppliers of services to NATO and NSPA, such as Company-1, from providing anything of value, other than an item of insignificant token value, to NATO and NSPA staff.

18.     As part of his job duties with NATO and NSPA with regard to Company-1, GRYWNOW played a role in NSPA's selection of contractors for NSPA projects and had access— or the ability to gain access—to confidential information pertaining to such projects, including projects that Company-1 won or sought to win. GRYWNOW'S fiduciary duty to NATO and NSPA obligated him to use and disclose confidential information only when authorized. GRYWNOW was not authorized to give NATO's and NSPA's confidential information to a contractor when doing so would give a contractor a competitive advantage and would otherwise be detrimental to the interests of NATO and NSPA.

19.     As part of his job duties with NATO and NSPA with regard to Company-1, GRYWNOW also played a role in the administration and oversight of ongoing contracts, including contracts awarded to Company-1. As part of the team managing contracts with Company-1, GRYWNOW'S fiduciary duty to NATO and NSPA also extended to his role in the administration and oversight of such contracts awarded to Company-1.

20.     As part of his job duties with NSPA with regard to Company-1, GRYWNOW filled out past performance evaluations for contractors who had worked on contracts that GRYWNOW had overseen, including for Company-1. GRYWNOW'S fiduciary duty to NATO and NSPA also extended to his role in filling out past performance evaluations for Company-1, including by providing truthful and accurate responses to the questions on the evaluations.

Defendants' Fraud Scheme

21.     Between at least in or around June 2014 and in or around December 2022, GRYWNOW and HATIPOGLU schemed to provide cash, gifts, and other things of value to GRYWNOW in exchange for GRYWNOW providing favorable treatment to HATIPOGLU and Company-1 in breach of GRYWNOW'S fiduciary duty to NATO and NSPA. As detailed below, this included GRYWNOW providing confidential information to Company-1 and providing favorable treatment to Company-1 both in the bidding process and during the performance of contracts Company-1 obtained from NSPA.

22.     The scheme also involved GRYWNOW and HATIPOGLU preparing and causing to be prepared fraudulent past performance questionnaires that GRYWNOW and HATIPOGLU submitted, and caused to be submitted, to USACE and the DLA for purposes of fraudulently inducing USACE and the DLA to award contracts to Company-1. By submitting these fraudulent questionnaires, GRYWNOW also breached his fiduciary duties to NATO and NSPA, as NATO and NSPA expected that GRYWNOW would only submit truthful responses on such questionnaires and that GRYWNOW would not sign and distribute favorable evaluations in exchange for bribes and kickbacks.

23.     One of GRYWNOW's untruthful responses on these questionnaires implicated his assessment of Company-1's compliance with the terms and provisions in NATO and NSPA contracts. The relevant contracts included a clause entitled "Integrity / No Bribe," which stated, among other things, that "it [was] strictly forbidden [for Company 1] to offer gifts or other advantages" to personnel working for NSPA and NATO and advised that violating this provision

allowed NSPA and NATO to terminate the contract at no cost and could trigger a referral to law enforcement.

24.     In light of this "Integrity / No Bribe" clause, GRYWNOW could not truthfully answer that Company-1 satisfactorily or commendably complied with NATO and NSPA contractual terms, as he knew Company-1 had violated this provision. And yet, as outlined below, GRYWNOW falsely represented that Company-1 had complied with such contract terms, among other false statements and material omissions that were part of the questionnaires and that are detailed below.

25.     The scheme began no later than in or around June 2014, at some location outside of the jurisdiction of any particular state or district of the United States, when GRYWNOW and HATIPOGLU agreed to use GRYWNOW's personal email address—instead of his NATO email address—to execute the scheme and conceal their conduct from NATO and others. On or about June 12, 2014, GRYWNOW stated in an email to HATIPOGLU, "[s]ometimes it is better not to communicate via our business email. If you have any private questions, please let me know and we can discuss this way . . . I not [sic] give this email to everybody."

26.     From June 2014 onward, GRYWNOW and HATIPOGLU communicated about the scheme over GRYWNOW's personal email. For example, in one email from March 16, 2015, GRYWNOW confirmed that he would overlap with HATIPOGLU in Dubai, United Arab Emirates, and then ultimately responded to a message from HATIPOGLU by saying, "OK, $$$.:- )))," after HATIPOGLU stated that he would pick up GRYWNOW from the airport and take him out to dinner.

27.    Later in the scheme, HATIPOGLU and GRYWNOW began communicating about the scheme using WhatsApp, a messaging service owned by Meta, which was a company headquartered in Menlo Park, California.

28.    HATIPOGLU and GRYWNOW's use of GRYWNOW's personal email address and WhatsApp was central to their scheme because these means of communication allowed HATIPOGLU and GRYWNOW to secretly discuss their plans with less risk of having their conduct discovered by NATO, USACE, the DLA, and others. The WhatsApp messages were even more effective at concealing their conduct because, as the first message to both HATIPOGLU and GRYWNOW in one of their WhatsApp chats stated, "[m]essages and calls [on WhatsApp] are end-to-end encrypted. No one outside of this chat, not even WhatsApp, can read or listen to them."

29.    As part of the scheme, GRYWNOW received things of value from HATIPOGLU and Company-1. These included, but were not limited to, the following:

(a)    In or around May 2015, including over WhatsApp, GRYWNOW solicited money from HATIPOGLU and then arranged to accept an envelope containing cash from HATIPOGLU's agent, which the agent delivered to GRYWNOW while GRYWNOW was at a restaurant located in or near a specific hotel in Dubai (the "Dubai Hotel"). The efforts of HATIPOGLU, GRYWNOW, and the agent to execute this aspect of the scheme required coordination between the three men over two separate WhatsApp chats. For example, just after GRYWNOW texted HATIPOGLU over WhatsApp that he was in a "fish restaurant" in the Dubai Hotel, HATIPOGLU texted this information to the agent over a separate WhatsApp chat. The agent subsequently confirmed over WhatsApp that he had made contact with

GRYWNOW and that he "handed over [e]nvelope [*sic*] . . . 1000 euro." On a separate WhatsApp chain between GRYWNOW and HATIPOGLU at about the same time as the agent was texting about the envelope, GRYWNOW confirmed that he "got" the payment.

(b)     In or about June 2015, including over WhatsApp, HATIPOGLU arranged to pay for GRYWNOW to have a romantic encounter with a woman at the Dubai Hotel. For example, over WhatsApp, HATIPOGLU arranged the encounter by first sending WhatsApp messages to a woman who was based in Dubai and with whom he had previously used WhatsApp to arrange for other romantic encounters. HATIPOGLU wrote to his contact, "I need [o]ne girl . . . For tomorrow" and directed that he needed this person to go to the Dubai Hotel. HATIPOGLU then clarified that, "I will pay for her" because the "cli[e]nt is my customer." In turn, HATIPOGLU's Dubai-based contact responded, "I found girl [*sic*]," and then asked HATIPOGLU to "[s]end me room number and guy number [*sic*] . . ." Shortly thereafter, HATIPOGLU messaged the room number of "2201," identified the occupant of the room as "Ralf Grywnow," and dictated a time for the encounter. HATIPOGLU then inquired if the woman in question was "the same girl . . . from last time," to which the contact clarified that she was a different woman unknown to HATIPOGLU.

(c)     Between in or around March 2018 and in or around October 2018, including over WhatsApp, GRYWNOW solicited HATIPOGLU to pay for—and HATIPOGLU arranged to pay for—portions of the construction of a home in Poland that was used

by GRYWNOW and another one of GRYWNOW's romantic partners. For example, over WhatsApp, GRYWNOW, who was in the European Union, asked HATIPOGLU about delays related to sending some of the construction products.

(d)    Between in or around May 2019 and in or around February 2020, including over WhatsApp, GRYWNOW solicited payments for—and HATIPOGLU arranged payments for—a portion of the remodeling of a kitchen to be used by GRYWNOW, and HATIPOGLU subsequently arranged payments for furniture to be used by GRYWNOW. The WhatsApp messages regarding payment for the kitchen included GRYWNOW sending HATIPOGLU images of invoices and HATIPOGLU then sending GRYWNOW an image confirming a portion of the payment.

(e)    Between in or around August 2020 and in or around September 2020, including over WhatsApp, GRYWNOW solicited HATIPOGLU to wire money to the bank account of GRYWNOW's romantic partner, and HATIPOGLU arranged for this payment to be made. These exchanges included GRYWNOW sending to HATIPOGLU an image of his romantic partner's bank account, which HATIPOGLU shared with someone whom HATIPOGLU had directed to effectuate the payment. After this initial exchange, GRYWNOW asked HATIPOGLU to confirm whether HATIPOGLU had made a payment, writing, "You sent to this account [*sic*]?," and "did you ma[k]e the Transaktion [*sic*]? I need to know, tomorrow we have the Meeting [*sic*] with the plumber. Thanks." GRYWNOW then confirmed that he had received payment by responding to HATIPOGLU's question

10

"How r u[?]," with a WhatsApp text stating, "all fine you[r s]upport arrived[.] [T]hanks a lot."

(f)     Between in or around May 2021 and in or around July 2021, including over WhatsApp, GRYWNOW solicited things of value from HATIPOGLU in the form of gold and jewelry. For example, these messages included an exchange between HATIPOGLU and GRYWNOW in which HATIPOGLU messaged GRYWNOW, "See u this week," to which GRYWNOW immediately responded, "What about €[?]" GRYWNOW then texted HATIPOGLU via WhatsApp shortly thereafter on the same day, "You have altin," using the Turkish word for gold.

30.    As part of the scheme, GRYWNOW took actions that benefited Company-1 and HATIPOGLU, including, but not limited to the following:

(a)     Between in or around June 2014 and in or around September 2015, GRYWNOW oversaw aspects of contracts for three NATO construction projects in Afghanistan that NATO had awarded to Company-1. These three NATO projects are referred to here as: (i) the fuel storage project; (ii) the firefighting infrastructure project; and (iii) the water and sewage project. As to these three contracts, GRYWNOW used his personal email address to provide confidential information to HATIPOGLU and approved actions taken by Company-1 on the projects.

(b)     In or around February 2017, at HATIPOGLU's request, GRYWNOW signed USACE forms that had in truth been filled out by Company-1 representatives. GRYWNOW affixed, or caused to be affixed to, an official NATO and NSPA stamp to the portion of the form that included his signature. These same forms

11

falsely stated that Company-1 had complied with the NATO and NSPA contract terms, omitted any discussion of HATIPOGLU's bribes to GRYWNOW, and favorably recommended Company-1 for USACE projects based on Company-1's performance on the NATO fuel storage, firefighting infrastructure, and water and sewage projects. Later that month, HATIPOGLU submitted or caused to be submitted to USACE—including using wire communications that entered the United States—the signed forms as part of a proposal to obtain the award of a USACE contract.

(c)     Between in or around November 2018 and in or around March 2020, including over WhatsApp, GRYWNOW provided HATIPOGLU with confidential information about multiple NATO-funded construction projects in and around Kabul, Afghanistan, and the adjacent city of Qargha, Afghanistan. After some of these contracts were awarded to Company-1, GRYWNOW played a role in the administration and supervision of those contracts, in at least some instances approving invoices submitted by Company-1.

(d)     In or around September 2019, including via WhatsApp, GRYWNOW provided HATIPOGLU with confidential information about another NATO construction project in Afghanistan, referred to here as the power generator project.

(e)     In or around April 2020, including via WhatsApp, GRYWNOW provided HATIPOGLU with confidential information about three additional NATO construction projects in Afghanistan. These three projects are referred to here as: (i) the training-area extension project; (ii) the logistics-upgrade project; and (iii) the

outdoor training facilities project.

(f)     Between in or around May 2020 and in or around June 2020, GRYWNOW signed past performance questionnaires for Company-1 on USACE forms that had in truth been filled out by Company-1 representatives, falsely stated that Company-1 had complied with the NATO and NSPA contract terms, omitted any discussion of HATIPOGLU's bribes to GRYWNOW, and favorably recommended Company-1 for future USACE contracts. GRYWNOW stamped the same questionnaires or caused them to be stamped with an official NATO and NSPA stamp and sent the questionnaires to Company-1. Company-1 then repeatedly sent the same forms to USACE—including by relying on wire communications that entered the United States.

(g)     In or around June 2020, GRYWNOW signed a past performance questionnaire favorably recommending Company-1 for a project with the DLA. In furtherance of this aspect of the scheme, HATIPOGLU used WhatsApp to instruct a Company-1 representative to send approximately three DLA past performance questionnaires that had already been filled out by Company-1 representatives to GRYWNOW for his signature. Contrary to the instructions on the forms, Company-1—not GRYWNOW—completed the narrative assessments of Company-1's performance. The next day, on or about June 9, 2020, GRYWNOW informed HATIPOGLU via WhatsApp that he would "pass" the questionnaires to the "US," meaning the United States. HATIPOGLU responded, instructing GRYWNOW to "[s]end it" and requested that GRYWNOW also send HATIPOGLU the questionnaires "with your

13

signature . . . so that I can use them in future other business." That same day, GRYWNOW used his official NATO email account to transmit the signed past performance questionnaires that had been completed by Company-1 to a representative of the DLA who was in Michigan and whose email account relied on email servers operating in the United States. GRYWNOW also sent the signed questionnaires to HATIPOGLU, despite the directive on the DLA questionnaires not to share them with the contractor. The questionnaires that GRYWNOW signed again falsely stated that Company-1 had complied with the NATO and NSPA contract terms, omitted any discussion of HATIPOGLU's bribes to GRYWNOW, and favorably recommended Company-1 for future DLA contracts.

(h)    Between in or around June 2020 and at least in or around September 2020, GRYWNOW used WhatsApp to provide HATIPOGLU confidential information about a series of NATO construction projects in Country-1, a NATO member nation.

(i)    In or around August 2020, GRYWNOW signed and advised others to sign Company-1's invoices for another NATO construction project in Afghanistan, referred to here as the women's training center project.

(j)    In or around January 2021, GRYWNOW used WhatsApp to provide HATIPOGLU confidential information about a NATO construction project at an airbase in Country-1.

(k)    In or about September 2021, GRYWNOW used WhatsApp to provide HATIPOGLU with confidential information about a NATO training facility

14

construction project in Country-2, which was another NATO member nation.

31.    In furtherance of the scheme, GRYWNOW and HATIPOGLU also deliberately concealed from NATO, USACE, and the DLA the personal benefits GRYWNOW received from HATIPOGLU and Company-1, and the fact that GRYWNOW provided beneficial treatment to HATIPOGLU and Company-1 in exchange for the benefits GRYWNOW received.

32.    The benefits on NATO contracts that HATIPOGLU and Company-1 received as the result of GRYWNOW's corrupt efforts on these contracts also served to assist HATIPOGLU and Company-1 with obtaining contracts with the United States military. For example, the fact that Company-1 had been able to secure military construction contracts with NATO made Company-1 more competitive for similar contracts with entities like USACE and the DLA, as Company-1 could highlight its work on military—as opposed to civilian—construction projects with a respected and well-recognized military entity like NATO.

33.    Many of the actions described above directly affected the interests of the United States, including but not limited to in the following ways:

(a)    NATO funding was authorized by Congress in Washington, D.C. As part of its commitment to NATO, the United States directly paid for—at the least—a percentage of NATO projects—many of which were then administered by NSPA.

(b)    Initial stages of many NATO projects were developed at NATO's Allied Command Transformation office, in Norfolk, Virginia, and at NATO Allied Command Operations ("ACO"). ACO was headquartered in Belgium and was run by the Supreme Allied Commander Europe, a role that was filled at all times relevant here by a member of the United States Navy, United States Army, or the United States

Air Force. Moreover, an American representative on a NATO committee approved funding for procurement projects and had oversight authority on such projects at multiple stages in the NATO procurement process.

(c)    United States military personnel, including those serving in positions with NATO, relied on infrastructure created through projects described in paragraph 30 above.

(d)    Past performance evaluations signed by GRYWNOW, in his capacity as a NATO and NSPA official, were used as the basis for bids for and, in some instances, awards of contracts with entities like USACE and the DLA.

34.    Under Title 18, United States Code, Section 3238, venue is proper in the District of Columbia for all the offenses outlined here because HATIPOGLU and GRYWNOW have no known residence in any district in the United States and the offenses began outside the jurisdiction of any particular state or district.

<u>Statutory Allegations</u>

35.    From at least in or around June 2014, and continuing through at least in or around December 2022,

**BAHADIR HATIPOGLU**
**and**
**RALF GRYWNOW**

did knowingly and intentionally, that is, with the intent to advance the conspiracy, combine, conspire, and agree with each other and other individuals, known and unknown, to commit certain offenses against the United States, namely:

(a)    Honest services wire fraud; that is, to knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud and deprive

16

NATO and NSPA of the honest services of GRYWNOW, by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Sections 1343 and 1346; and

(b)     Wire fraud; that is to knowingly, and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud USACE and the DLA, and to obtain money and property from USACE and the DLA by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made, transmit and cause to be transmitted, by means of wire communications in interstate and foreign commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

<u>Purpose</u>

36.     GRYWNOW and HATIPOGLU's purpose was to benefit and enrich themselves and Company-1 through this scheme, both through GRYWNOW receiving bribes and kickbacks, and HATIPOGLU and Company-1 receiving contracts from NATO, USACE, and the DLA, and receiving favorable treatment in connection with such contracts and potential contracts.

17

<u>Manner and Means</u>

37.     In furtherance of the conspiracy, and to accomplish its objects, the methods, manner, and means that were used are described in paragraphs 21 through 34 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

(All in violation of Title 18, United States Code, Section 1349).

## COUNTS 2-5
### (Wire Fraud)
**[Title 18, United States Code, §§ 1343, 1346, and 2]**

38.     Paragraphs 1 through 20 and paragraphs 33 and 34 of this Indictment are realleged and incorporated by reference as though fully set forth herein.

39.     From at least in or around June 2014, and continuing through at least in or around December 2022,

**BAHADIR HATIPOGLU**
**and**
**RALF GRYWNOW**

did knowingly and with the intent to defraud, having devised and intending to devise a scheme and artifice to defraud to: (a) deprive NATO and NSPA of the intangible right to honest services by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made and for the purpose of executing such scheme and artifice, and (b) obtain money and property from USACE and the DLA by means of materially false and fraudulent pretenses, representations, and promises, knowing such pretenses, representations, and promises were false and fraudulent when made and for the purpose of executing such scheme and artifice, transmit and cause to be transmitted, by

18

means of wire communications in interstate and foreign commerce, writings, signals, pictures, and sounds, for the purpose of executing such scheme and artifice.

Purpose

40.    The Grand Jury realleges and incorporates by reference paragraph 36 of this Indictment as a description of the purpose of the scheme and artifice to defraud.

Scheme and Artifice to Defraud

41.    The Grand Jury realleges and incorporates by reference paragraphs 21 through 32 of this Indictment as a description of the scheme and artifice to defraud.

Use of the Wires

42.    On or about the dates specified as to each count below, GRYWNOW and HATIPOGLU, for the purpose of executing the aforesaid scheme and artifice to defraud, and attempting to do so, did knowingly transmit and cause to be transmitted, by means of wire, radio, and television communication, writings, signals, pictures, and sounds in interstate and foreign commerce the following:

| Count | On or About Date | Description of Wire |
|:-----:|:----------------:|:--------------------|
| 2 | June 9, 2020 | Email from GRYWNOW to a representative of the DLA located in the United States, which was transmitted to servers located in the United States, and in which GRYWNOW attached signed versions of performance evaluations that had been filled out by representatives of Company-1 and that related to Company-1's bid for a contract related to the disposal of United States military equipment in Afghanistan. |

| Count | On or About Date | Description of Wire |
|-------|------------------|---------------------|
| 3 | August 22, 2021 | Upload made by Company-1 representatives to a file transfer platform operated by the United States Department of Defense. The upload related to a project to construct a fire station for USACE, included versions of past performance evaluations signed by GRYWNOW, and was transmitted to servers located in the United States. |
| 4 | August 22, 2021 | Email from a representative of Company-1 for a USACE contract to construct a fire station, which was sent to a representative of USACE, transmitted to servers located in the United States, and referenced a proposal that included past performance reviews signed by GRYWNOW. |
| 5 | June 1, 2022 | Email from Company-1 for a USACE contract to construct a nursing home, which was sent to representatives of USACE, transmitted to servers located in the United States, and included past performance reviews signed by GRYWNOW. |

(Each in violation of Title 18, United States Code, Sections 1343, 1346, and 2.)

## FORFEITURE ALLEGATIONS

43.    As the result of committing one or more of the conspiracy and wire fraud offenses alleged in Counts 1–5, in violation of 18 U.S.C. §§ 1343, 1346, and 1349, GRYWNOW and HATIPOGLU shall forfeit to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461, all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of the offenses.

44.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the defendants:

      (a)    cannot be located upon the exercise of due diligence;

      (b)    has been transferred or sold to, or deposited with, a third party;

20

(c)     has been placed beyond the jurisdiction of the Court;

(d)     has been substantially diminished in value; or

(e)     has been commingled with other property that cannot be subdivided without

difficulty,

the defendants shall forfeit to the United States any other property of the defendant, up to the value

of the property described above, pursuant to 21 U.S.C. § 853(p), as incorporated by 18 U.S.C.

§ 982(b)(1) and 28 U.S.C. § 2461(c).

A TRUE BILL

FOREPERSON

LORINDA I. LARYEA
ACTING CHIEF, FRAUD SECTION
UNITED STATES DEPARTMENT OF JUSTICE, CRIMINAL DIVISION


By:     _____
DERMOT LYNCH
SHY JACKSON
PATRICK BROWN
TRIAL ATTORNEYS, FRAUD SECTION

21